# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC., individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ASTRAZENECA PHARMACEUTICALS L.P.; ASTRAZENECA L.P.; ASTRAZENECA UK LIMITED; HANDA PHARMACEUTICALS, LLC; and PAR PHARMACEUTICAL, INC., | |
| Defendants. | |

## I.    INTRODUCTION

1.    Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. ("Plaintiff" or "KPH") brings this Class Action Complaint on behalf of itself and on behalf of a Class of Direct Purchasers of Seroquel XR® (quetiapine fumarate extended-release tablets) ("Seroquel XR") from Defendants AstraZeneca Pharmaceuticals L.P.; AstraZeneca L.P. (collectively, "AstraZeneca"); Handa Pharmaceuticals, LLC ("Handa"); and Par Pharmaceutical, Inc. ("Par") during the period September 29, 2011 through the present (hereinafter referred to as "Class Period").

2.    Plaintiff's claims arise from Defendants' unlawful  scheme to monopolize the market for Seroquel XR.

3.    As a result of Defendants' anticompetitive scheme, Plaintiff and Members of the

Direct Purchaser Class paid more for Seroquel XR than they otherwise would have paid in the absence of Defendants' unlawful conduct. As set forth below, Defendants' conduct violates the federal antitrust laws, in particular Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 ("Sherman Act").

4.     Plaintiff makes the allegations herein based on personal knowledge, the investigation of counsel, and upon information and belief as to all other matters.

## II.     NATURE OF THE CASE

5.     Defendants have unlawfully monopolized the market for Seroquel XR and have foreclosed competition in the market for Seroquel XR in the United States, in violation of the Sherman Act. This misconduct enabled Defendants to overcharge Plaintiff and members of the proposed class of Direct Purchasers for Seroquel XR.

6.     Defendants' unlawful scheme  consisted of, among other things, AstraZeneca's entering into agreements with Handa and Accord Pharmaceuticals, Inc. ("Accord") not to compete in the market for Seroquel XR and AB-rated generic equivalents, and Handa's subsequent assignment of the unlawful agreement to Par, which performed the agreement, sold AB-rated generic Seroquel XR at supracompetitive prices, and shared the unlawful gains with Handa. As a result, Plaintiff and other Direct Purchasers were deprived of a competitive market for Seroquel XR.

7.     Accordingly, Plaintiff, on behalf of itself and the proposed Direct Purchaser Class, seeks redress for the overcharge damages sustained as a result of Defendants' unlawful monopolization and other anticompetitive conduct in violation of the Sherman Act. But for Defendants' illegal conduct, Plaintiff and Members of the proposed Direct Purchaser Class would not have paid supracompetitive prices for Seroquel XR.

### III.  JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action as it arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.  Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

9.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because during the Class Period, Defendants transact business in the United States, including in substantial part in this District.

10.    During the Class Period, Defendants manufactured, sold, and/or shipped Seroquel XR in a continuous and uninterrupted flow of interstate commerce, which included sales of Seroquel XR in the United States, including in this District.  Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

11.    During the Class Period, each Defendant or at least one of its affiliates used the instrumentalities of interstate commerce to join or effectuate the contracts and conspiracy alleged herein.

12.    This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the manufacturing, selling and/or distribution of Seroquel XR throughout the United States, including in this District; (c) had and maintained substantial contacts with the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for Seroquel XR that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

13.     Furthermore, Plaintiff KPH Healthcare Services, Inc. is a New York corporation and paid supracompetitive prices for Seroquel XR in New York as a result of Defendants' illegal conduct, as alleged in further detail below.

## IV.     THE PARTIES

14.     Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. is a corporation organized under the laws of the State of New York, with headquarters in Gouverneur, New York. KPH operates retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc. KPH is the assignee of McKesson Corporation, who directly purchased branded Seroquel XR and AB-rated generic Seroquel XR from AstraZeneca and Par, respectively, during the Class Period. As a result of Defendants' alleged anticompetitive conduct, KPH paid supracompetitive prices for its Seroquel XR purchases and KPH was injured by the illegal conduct alleged herein.

15.     Defendant AstraZeneca Pharmaceuticals LP is a limited partnership organized under the laws of Delaware, with a principal place of business at 1800 Concord Pike, Wilmington, Delaware 19803.

16.     Defendant AstraZeneca LP is a Delaware limited partnership with its principal place of business at 1800 Concord Pike, Wilmington, Delaware 19803.

17.     Defendant AstraZeneca UK Limited is a company operating and existing under the laws of the United Kingdom, with its principal place of business at 15 Stanhope Gate, London, United Kingdom W1Y 6LN.

18.     Defendant Handa Pharmaceuticals, LLC is a limited liability corporation organized under the laws of California, with a principal place of business at 1732 N. 1st Street, Suite 200, San Jose, California 95112.

19.     Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977.

20.     Defendants have engaged in the conduct alleged in this Complaint, and/or the Defendants' officers, agents, employees, or representatives have engaged in the alleged conduct while actively involved in the management of Defendants' businesses and affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual and/or apparent authority.

## V.     LEGAL AND REGULATORY BACKGROUND

### A.     The Regulatory Structure for Approval of Generic Drugs and Substitution of Generics for Brand Name Drugs

21.     Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), manufacturers who create a new drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA"). 21 U.S.C. §§ 301-392. An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. §§ 355(a) & (b).

22.     When the FDA approves a brand name manufacturer's NDA, the brand manufacturer may list any patents that the brand manufacturer believes could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic version of the brand name drug prior to the expiration of the listed patents in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book." Patents issued after NDA approval may be listed within 30 days of issuance.  21 U.S.C. §§ 355 (b) (1) & (c) (2).

23.     A patent applicant is subject to special oaths and duties, such as the duties of disclosure, candor, and good faith, during patent prosecution. A patent applicant is required to

disclose to the PTO of "all information known . . . to be material to patentability" including with respect to prior art. *See* 37 C.F.R. § 1.56. This duty extends to all inventors named on a patent application and any "attorney or agent who prepares or prosecutes the application," as well as "[e]very other person who is substantively involved in the preparation or prosecution of the application." *Id*. § 1.56(c). Where fraud on the PTO "was practiced or attempted" or the duty of disclosure, candor, and good faith "was violated through bad faith or intentional misconduct" no patent should be granted. *Id*. § 1.56(a).

24.     The FDA relies completely on the brand name manufacturer's truthfulness about patents' validity and applicability; the FDA has neither the authority nor the resources to check the manufacturer's representations for accuracy or trustworthiness.

**B.     The Hatch-Waxman Amendments Advanced the Goal of Providing Access to Generic Pharmaceuticals**

25.     The Hatch-Waxman Amendments enacted in 1984 simplified the regulatory hurdles for prospective generic manufacturers by eliminating the need for them to file lengthy and costly NDAs. *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984). A generic manufacturer seeking approval to sell a generic version of a brand name drug may now file an Abbreviated New Drug Application (ANDA). An ANDA relies on the scientific findings of safety and effectiveness included in the brand name drug manufacturer's original NDA but must show that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug – that is, that the generic drug is bioequivalent to the brand name drug. The FDA assigns generic drugs that are bioequivalent to branded drugs an "AB" rating.[1]

---

[1] Generic manufacturers can also seek approval of non-AB-rated generics. The FDCA permits "hybrid" applications that are neither full NDAs containing safety and efficacy data, nor ANDA applications showing that the proposed product is the "same" as the NDA product. 21 U.S.C. § 505(b)(2). Drug

26.     The FDCA and Hatch-Waxman Amendments operate on the presumption that bioequivalent drug products containing identical amounts of the same active ingredients in the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity and identity, are therapeutically equivalent and may be substituted for one another.  Thus, bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the branded counterpart.  21 U.S.C. § 355(j) (8) (B).

27.     Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of generic drugs, thereby reducing healthcare expenses nationwide.  Congress also wanted to protect pharmaceutical companies' incentives to create new and innovative products.

28.     The Hatch-Waxman Amendments achieved both goals, substantially advancing the rate of generic product launches, and ushering in an era of historic high profit margins for brand name pharmaceutical companies.  In 1983, pre-Hatch Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic versions available; by 1998, nearly all did.  In 1984, prescription drug revenue for branded and generics totaled $21.6 billion and generic drugs accounted for 18.6% of prescriptions.  By 2009, total prescription drug revenue had soared to $300 billion and generic drugs accounted for 75% of prescriptions.

### C.     ANDA Patent Certification Provides Incentives to Generic Manufacturers to Challenge Patents

29.     To obtain FDA approval of an ANDA, a generic manufacturer must certify that the generic drug addressed in its ANDA will not infringe any patents listed in the Orange Book.  Under Hatch-Waxman, a generic manufacturer's ANDA must contain one of four certifications:

---

products approved under this section use a safe and effective active pharmaceutical ingredient but modify the drug product in some way so that it differs from the original NDA product, either in dosage form, strength, route of administration, formulation, dosing regimen, or indication.  These non-AB-rated generics are not bioequivalent to the innovator product.  *See* 21 C.F.R. § 314.54 (2019).

i. that no patent for the brand name drug has been filed with the FDA (a "Paragraph I certification");

ii. that the patent for the brand name drug has expired (a "Paragraph II certification");

iii. that the patent for the brand name drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III certification"); or

iv. that the patent for the brand name drug is invalid or will not be infringed by the generic manufacturer's proposed product (a "Paragraph IV certification").

30.     If a generic manufacturer files a Paragraph IV certification, a brand name manufacturer has the ability to delay FDA approval of an ANDA simply by suing the ANDA applicant for patent infringement. If the brand name manufacturer initiates a patent infringement action against the generic filer within 45 days of receiving notification of the Paragraph IV certification, the FDA may not grant final approval to the ANDA until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. The FDA may grant "tentative approval," but cannot authorize the generic manufacturer to go to market.

31.     As an incentive to spur generic companies to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification gets a period of protection from competition with other generic versions of the drug. For Paragraph IV certifications made prior to December 2003, the first generic applicant is entitled to 180 days of market exclusivity, *i.e.*, the first approved generic is the only available generic for at least six months.

32.     Brand name manufacturers are incentivized to list patents in the Orange Book due to the high profit margins on brand name drugs and the erosion of those profits due to generic

entry. Brand name manufacturers are motivated to sue any generic competitor that files an ANDA with Paragraph IV certifications even if the generic competitor's product does not actually infringe the listed patent(s) and/or the patent is invalid and unenforceable. As a result, final FDA approval of an ANDA can be delayed for up to 30 months.

### D. Generic Competition Serves the Public Interest

33. Typically, AB-rated generics cost much less than their branded counterparts. Over time, as more generic equivalents compete with each other, prices decline even further. Since passage of the Hatch-Waxman Amendments, every state has adopted substitution laws that either require or permit pharmacies to substitute AB-rated generic equivalents for branded prescriptions (unless the prescribing physician has specifically ordered otherwise).

34. Every link in the prescription drug chain has an incentive to choose less-expensive generic equivalents. As a result of federal reimbursement rules and the industry pricing structure, pharmacies typically earn a higher markup on generics. Private health insurers similarly offer direct incentives to pharmacies to substitute cheaper generic products for more expensive branded ones. Health insurers are contractually obligated to pay for the bulk of their members' prescriptions, whether filled with branded or generic drugs, so health insurers offer their members lower copays for generic drugs in order to encourage the use of generics. Members also face the threat of increased health insurance premiums if branded prescription drug costs continue to rise.

35. Once a generic equivalent hits the market, the generic quickly causes sales of the branded drug to diminish. More than 90% of prescriptions for drugs that are available in both branded and generic forms are filled with a generic. The speed with which generic drugs take over the market appears to be increasing: in a sample of drugs losing patent protection between 1991 and 1993, generics on average held a 44% market share after one year; by 2010, IMS

industry data reflects that, on average, generics capture 80% of the brand's sales within 6 months.

36.     Because of the strong potential for generics to diminish sales of brand name drugs, brand name manufacturers are motivated to extend their market dominance for as long as possible.

### E.      Pay-for-Delay Agreements Between Brand and Generic Competitors

37.     "Pay-for-Delay" Agreements are unlawful pay-off deals between the patent holder (usually the brand company) and the first-filer, in which the patent holder pays the generic competitor to keep its generic product off the market. These agreements turn the usual patent infringement settlement scheme on its head: instead of the alleged infringer paying royalty rent to the patent holder, the patent holder pays the alleged infringer to stay off the market. Also referred to as "pay-for-delay" agreements or "exclusion payment" agreements, these agreements are effectively illegal market allocation agreements.

38.     These agreements have the impact of delaying subsequent generic ANDA filers from coming to market.  Later ANDA filers have more modest financial expectations because they have no expectation of any form of market exclusivity. By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG), and thus, the drug has already been commoditized.

39.     When an anticompetitive agreement with the first filer is already in place, however, litigation becomes less attractive to later filers. The later generic manufacturers know that the first filer is not leading the charge against the brand's patent(s) (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive, reverse payment settlement). The later generics have to bear the brunt of the litigation costs themselves, and, upon prevailing in the patent litigation, expect to face competition from at least the first filer

generic, and typically an authorized generic as well, despite having expended time and resources litigating the infringement case. The first settlement between a brand and first-filer generic (such as the Exclusion Payment Agreement at issue here) will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer is permitted to launch then as well – greatly reducing the incentive the later filer would otherwise have to continue fighting to enter as soon as possible.

40. Thus, some later generics decide to simply give in to the conspiracy between the brand manufacturer and the first-filer generic and decide not to pursue challenges to the brand's patent(s).

**F.     No AG Clauses Provide a Means for Manufacturers to Share the Gains From Conspiring**

41. In the 1990s, the pay-offs from brand manufacturers often took the form of cash payments to the generic competitor. Since the 2000s, as a result of regulatory scrutiny, congressional investigations, and class action lawsuits, brand and generic manufacturers have entered into increasingly more elaborate agreements in an attempt to hide pay-offs.

42. One form of pay-off, at issue here, is the "no-AG" promise. With a no-AG promise, the brand manufacturer agrees not to market an authorized generic version of the brand drug for some period of time after the first generic enters.

43. Again, the first filer's ANDA exclusivity does not prohibit the brand manufacturer from marketing its AG under the authority of its NDA. The Hatch-Waxman amendments' 180-day marketing period is "exclusive" only as against other ANDA-based products, not as against the brand manufacturer's NDA-based AG.

44. Absent a no-AG promise, it almost always makes economic sense for the brand manufacturer to begin marketing an AG as soon as (or sometimes weeks or months before) the

first generic enters the marketplace. But competition from an AG has a drastically negative effect on the first-filer generic's revenues. Competition from an AG typically cuts the first filer's revenues by more than half, as the competing generic takes a substantial volume of the unit sales and drives prices lower—delivering commensurate savings to drug purchasers.

45.     To prevent an AG from causing this substantial loss of revenues and profits, a first-filer generic may be willing to delay its entry into the marketplace in return for the brand manufacturer's agreement to forgo competing with an AG. The additional monopoly profits that the brand manufacturer gains from the delayed onset of generic competition more than makes up for the profits it forgoes by not competing with an AG. The brand manufacturer gains from the delayed onset of generic competition. The first filer gains from the absence of generic competition for the first 180 days of marketing. But drug purchasers lose.

46.     The brand and first filer's reciprocal pledges not to compete harm purchasers thrice over. The pact delays the first filer's entry into the marketplace and thereby extends the time during which the more expensive brand is the only product on the market. By delaying the first filer's entry, the pact also delays the time when other, later, generics enter. And the pact prevents the brand from marketing an AG during the 180-day exclusivity period, reducing price competition during that period, particularly price competition that would otherwise occur between the first filer's generic and the brand's AG.

47.     For the first filer, the difference between selling the only generic and competing against an AG for 180 days can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales. A no-AG pledge thus has the same economic effect as a pay-off made in cash. As explained by the then-Chairman of the FTC:

> Because the impact of an authorized generic on first-filer revenue
> is so sizable, the ability to promise not to launch an AG is a huge

bargaining chip the brand company can use in settlement negotiations with a first-filer generic. It used to be that a brand might say to a generic, "if you go away for several years, I'll give you $200 million." Now, the brand might say to the generic, "if I launch an AG, you will be penalized $200 million, so why don't you go away for a few years and I won't launch an AG."[2]

Courts agree that no-AG agreements are a form of payment actionable under *Actavis* and are anticompetitive.[3]

48. For a first ANDA filer (like Handa and Accord) for a brand drug with billions of dollars in annual sales (like Seroquel XR), the difference between selling a generic without having to compete against an AG and selling in competition with an AG can amount to hundreds of millions of dollars. These economic realities are well known in the pharmaceutical industry. No-AG agreements thus allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition.

## VI.    FACTUAL ALLEGATIONS

### A.    Seroquel XR is Approved to Treat Mental Disorders

49. Major depressive disorder is a serious, recurrent condition consisting of many of the following symptoms: depressed mood most of the day, diminished interest or pleasure in activities that used to be enjoyable, significant weight loss or gain, difficulty sleeping or sleeping

---

[2] Press Release, Fed. Trade Comm'n, *Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics*, (June 24, 2009), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz. pdf.

[3] *See In re Loestrin 24 Fe Antitrust Litig.*, Nos. 14-2071, 15-1250, 2016 U.S. App. LEXIS 3049, at *25-26 (1st Cir. Feb. 22, 2016); *In re Opana ER Antitrust Litig.*, No. 14 C 10150, 2016 U.S. Dist. LEXIS 16700, at *23-25 (N.D. Ill. Feb. 10, 2016); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 242 (D. Conn. 2015); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 U.S. Dist. LEXIS 142206, at *62 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. Astrazeneca AB*, 52 F. Supp. 3d 705, 709-10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

too much, agitation, fatigue, feelings of worthlessness or guilt, poor concentration, indecisiveness, and suicidal ideation.[4] Major depressive disorder affects approximately 17.3 million American adults, about 7.1% of the adult population, each year.[5]

50.     Bipolar disorder, previously known as manic depression, is a mood disorder believed to be caused by chemical imbalances in the brain, resulting in extreme swings in mood from manic highs to depressive lows that can last from hours to months.[6] Approximately 5.7 million adults in the United States, about 2.6% of the adult population, suffer from bipolar disorder each year.[7]

51.     Schizophrenia is a serious mental disorder in which patients may exhibit some combination of the following symptoms: delusions, hallucinations, and disorganized speech and behavior, and other symptoms that cause social or occupational dysfunction.[8]

52.     Seroquel XR is an antipsychotic drug approved in adults for (1) add-on treatment to antidepressants for patients with major depressive disorder who did not have an adequate response to antidepressant family; (2) acute depressive episodes in bipolar disorder; (3) acute manic or mixed episodes in bipolar disorder alone or with lithium or divalproex; (4) long-term treatment of bipolar disorder with lithium or divalproex; and (5) schizophrenia.[9]

## B.     AstraZeneca's Seroquel XR Patents

53.     AstraZeneca Pharmaceuticals LP is the holder of NDA No. 22-047, under which

---

[4]     *Symptoms of Depression*, Seroquel XR, https://www.seroquelxr.com/major-depressive-disorder/symptoms-of-depression.html.

[5]     *Depression Statistics*, Depression and Bipolar Support Alliance, https://www.dbsalliance.org/education/depression/statistics/.

[6]     *See Bipolar Disorder*, Depression and Bipolar Support Alliance, https://www.dbsalliance.org/education/bipolar-disorder/.

[7]     *Bipolar Disorder Statistics*, Depression and Bipolar Support Alliance, https://www.dbsalliance.org/education/bipolar-disorder/bipolar-disorder-statistics/.

[8]     *Schizophrenia*, National Institute of Mental Health, https://www.nimh.nih.gov/health/topics/schizophrenia/index.shtml.

[9]     Seroquel XR patient website (visited November 25, 2019), https://www.seroquelxr.com.

the FDA granted approval for extended-release tablets containing various different dosage strengths of the active ingredient 11-[4-[2-(2-hydroxyethoxy)ethyl]-1-piperazinyl] dibenzo [b,f] [1,4] thiazepine fumarate, which is commonly referred to as quetiapine fumarate. AstraZeneca Pharmaceuticals LP markets these tablets in the United States under the trademark Seroquel® XR.

54. AstraZeneca Pharmaceuticals LP is the owner of U.S. Patent No. 4,879,288 ("the '288 Patent"). The '288 Patent issued on November 7, 1989 from United States Application No. 07/028,473, which was filed on March 20, 1987. Although the '288 Patent was originally set to expire on March 20, 2007, it received a patent term extension ("PTE") of 1,651 days under 35 U.S.C. 156. Based upon the PTE, the '288 Patent expired on September 26, 2011.

55. AstraZeneca UK Limited is the owner of the '437 Patent. The '437 Patent issued on September 7, 1999 from United States Application No. 08/864,306, which was filed on May 28, 1997. The '437 Patent expired on May 28, 2017.

56. AstraZeneca submitted the '288 and '437 Patents for listing in the FDA Orange Book under NDA No. 22-047. AstraZeneca Pharmaceuticals LP received pediatric exclusivity[10] for NDA No. 22-047. The pediatric exclusivity associated with the '288 and '437 Patents expired on March 26, 2012 and November 28, 2017, respectively.

57. Because the '288 Patent expired on September 26, 2011 and its pediatric exclusivity expired on March 26, 2012, neither the '288 Patent nor its associated pediatric exclusivity could have affected any generic drug company's right, ability or willingness to market a generic version of Seroquel XR after March 26, 2012.

58. The '437 Patent contains one independent claim and fourteen dependent claims.

---

[10] 35 U.S.C. § 355a incentivized drug developers to conduct studies on their drugs in pediatric patients by granting successful studies an additional six months of regulatory exclusivity after patent expiration.

Independent claim 1 recites:

> A sustained release formulation comprising a gelling agent and 11-
> [4-[2-(2-hydroxyethoxy) ethyl]-1-piperazinyl]dibenzo-[b,f][1,4]-
> thiazepine or a pharmaceutically acceptable salt thereof, together
> with one or more pharmaceutically acceptable excipients.

Each of the fourteen dependent claims in the '437 Patent incorporate the requirements of claim 1, including the requirement for a "gelling agent." "It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to be infringed." *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). Accordingly, no generic drug company's ANDA or generic drug product could infringe the '437 Patent unless it contained, *inter alia*, a "gelling agent" as claimed in the '437 Patent.

### C.    Handa and Accord file ANDAs for Generic Versions of Seroquel XR

59.    Handa and Accord were the first generic manufacturers to file ANDAs with the FDA containing Paragraph IV certifications regarding Seroquel XR patents.

60.    Handa filed ANDA No. 90-482 for a generic version of extended-release quetiapine fumarate, and amended it four times, between spring and fall of 2008. On information and belief, Handa was the first applicant to file a substantially complete ANDA containing a Paragraph IV certification for the 50mg, 150mg, 200mg, 300mg strengths, making Handa eligible for 180 days of regulatory exclusivity for those strengths of generic Seroquel XR.[11]

61.    Handa's ANDA also included a Paragraph IV certification for the 400mg strength, although Handa was not the first applicant to file a substantially complete application containing a Paragraph IV certification for the 400mg strength.

62.    Accord filed ANDA No. 90-681 for a generic version of extended-release

---

[11] U.S. Food & Drug Admin., *Patent Certifications and Suitability Petitions* (July 2, 2019), https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/patent-certifications-and-suitability-petitions.

quetiapine fumarate on June 18, 2008.[12] On information and belief, Accord was the first applicant to file a substantially complete application containing a Paragraph IV certification for the 400mg strength of extended-release quetiapine fumarate, making Accord eligible for 180 days of regulatory exclusivity for that strength of generic Seroquel XR.

63.     Because Handa and Accord were the first companies to file substantially complete ANDAs with Paragraph IV certifications, they each stood to receive a significant and potentially highly profitable benefit under 21 U.S.C. 355(j)(5)(B)(iv): 180-days of marketing exclusivity during which the FDA would not give final approval to any other ANDA filer's generic equivalent of Seroquel XR.

64.     After receiving confirmation of receipt from the FDA for their ANDAs, pursuant to 21 U.S.C. § 355(j)(2)(B), Handa sent four separate Paragraph IV notice letters to AstraZeneca of its ANDA, each containing Paragraph IV certifications that included a detailed statement of the factual and legal basis as to why the '437 Patent was invalid, unenforceable, and/or not infringed by Handa's ANDA products.[13] The Paragraph IV notice letters included certifications that Handa intended to seek final FDA approval to market and to launch its AB-rated generic Seroquel XR products before the expiration of the '437 Patent. The letters also included an offer of confidential access to Handa's ANDA as required under the Hatch-Waxman Act. The notice letters were dated July 10, 2008, July 23, 2008, October 16, 2008, and November 14, 2008. The notice letters gave rise to an artificial act of infringement for purposes of creating standing, thereby allowing AstraZeneca to bring a cause of action for infringement against Handa under the Hatch-Waxman Act (if AstraZeneca otherwise had a basis to sue under Rule 11).

---

[12] *See id. See also* Final Approval Letter from Carol Holquist, Deputy Director, Office of Regulatory Operations, FDA, to Sabita Nair, Senior Director, Regulatory Affairs, Accord Healthcare Inc., at 2 (Nov. 1, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2016/090681Orig1s000TAltr.pdf.
[13] Stipulated Facts ¶ 26, ECF No. 156-1, *AstraZeneca Pharm. LP et al. v. Handa Pharm., LLC*, 3:10-cv-01835-JAP-TJB (D.N.J.).

65.     Similarly, Accord sent AstraZeneca two separate Paragraph IV notice letters dated September 5, 2008 and January 23, 2009.[14] Accord's Paragraph IV certifications were required by statute to include "a detailed statement of the factual and legal basis of the opinion of the applicant that ['437 Patent] is invalid or will not be infringed," by Accord's generic Seroquel XR products.[15] The Paragraph IV notice letters included certifications that Accord intended to seek final FDA approval to market and to launch its AB-rated generic Seroquel XR products before the expiration of the '437 Patent. On information and belief, Accord's Paragraph IV notice letters also included an offer of confidential access to Accord's ANDA as required under the Hatch-Waxman Act. The notice letters gave rise to an artificial act of infringement for purposes of creating standing, thereby allowing AstraZeneca to bring a cause of action for infringement against Accord under the Hatch-Waxman Act (if AstraZeneca otherwise had a basis to sue under Rule 11).

### D.     The Seroquel XR Patent Litigation

66.     AstraZeneca filed three patent infringement lawsuits against Handa in response to Handa's Paragraph IV certification notice letters. First, in response to Handa's notice letters dated July 10, 2008 and July 23, 2008, AstraZeneca filed civil action no. 08-cv-3773 in the United States District Court for the District of New Jersey on July 28, 2008.[16] Second, on October 28, 2008, AstraZeneca filed civil action no. 08-cv-5328 in the District of New Jersey in response to Handa's notice letter dated October 16, 2008.[17] Third, on December 8, 2008, AstraZeneca filed civil action no. 08-cv-5997 in the District of New Jersey in response to

---

[14] *Id.* ¶ 27.
[15] 21 U.S.C. § 355(j)(2)(B)(iv)(II).
[16] Stipulated Facts ¶ 34, ECF No. 156-1, *AstraZeneca Pharm. LP et al. v. Handa Pharm., LLC*, 3:10- cv-01835-JAP-TJB.
[17] *Id.* ¶ 35.

Handa's notice letter dated November 14, 2008.[18]  These three lawsuits are collectively referred to as the "Handa Seroquel XR Patent Litigation."

67.     AstraZeneca filed two patent infringement lawsuits against Accord in response to Accord's Paragraph IV certification notice letters. First, on September 26, 2008, AstraZeneca filed civil action no. 08-cv-04804 against Accord in the District of New Jersey in response to Accord's notice letter dated September 5, 2008.[19] Second, on February 10, 2009, AstraZeneca filed civil action no. 09-cv-00619 against Accord in the District of New Jersey in response to Accord's notice letter dated January 23, 2009.[20] These three lawsuits are collectively referred to as the "Accord Seroquel XR Patent Litigation."

68.     Several generic drug companies in addition to Handa and Accord filed ANDAs seeking approval of generic versions of Seroquel XR ("the Later-Filing Generics"). AstraZeneca subsequently filed seven patent infringement lawsuits relating to generic Seroquel XR against four of the Later-Filing Generics in the District of New Jersey.

- On April 8, 2010, AstraZeneca filed civil action no. 10-cv-1835 against Anchen Pharmaceuticals, Inc. and Anchen, Inc. (together, "Anchen").

- On August 16, 2010, AstraZeneca filed civil action no. 10-cv-4203 against Osmotica Pharmaceutical Corporation ("Osmotica").

- On August 16, 2010, AstraZeneca filed civil action no. 10-cv-4205 against Torrent Pharmaceuticals Limited and Torrent Pharma Inc. (together, "Torrent").

- On September 28, 2010, AstraZeneca filed civil action no. 10-cv-4971 against Torrent.

- On October 22, 2010, AstraZeneca filed civil action no. 10-cv-5519 against Mylan Pharmaceuticals, Inc. and Mylan, Inc. (together, "Mylan").

- On April 29, 2011, AstraZeneca filed civil action no. 11-cv-2483 against Mylan.

---

[18] *Id.* ¶ 36.
[19] *Id.* ¶¶ 37-38.
[20] *Id.* ¶ 38.

- On April 29, 2011, AstraZeneca filed civil action no. 11-cv-2484 against Osmotica.

The foregoing seven patent infringement lawsuits are referred to herein as "the Later-Filer Seroquel XR Patent Litigation."

69.     The Handa Seroquel XR Patent Litigation, the Accord Seroquel XR Patent Litigation, and the Later-Filer Seroquel XR Patent Litigation are referred to collectively as "the Seroquel XR Patent Litigation."

70.     During claim construction proceedings in the Seroquel XR Patent Litigation, the district court construed the term "gelling agent" as "any substance which forms a gel when in contact with water."[21] The November 30, 2010 claim construction opinion was applicable in both the Handa Seroquel XR Patent Litigation and the Accord Seroquel XR Patent Litigation.[22] As discussed below, the court's understanding of "gelling agent" meant that the Handa's proposed generic Seroquel XR would not infringe the '437 Patent because Handa's generic used hydrogenated vegetable oil ("HVO"). Hydrogenated vegetable oil is hydrophobic, does not form a homogenous mixture with water, and therefore could not  be a "gelling agent" under the court's definition.

71.     On information and belief, the 30-month stay preventing final FDA approval of Handa's ANDA expired no later than April 2011. On information and belief, the 30-month stay preventing final FDA approval of Accord's ANDA expired no later than July 2011.

72.     On or about September 29, 2011, as further described below, AstraZeneca reached a settlement with Handa resolving the Handa Seroquel XR Patent Litigation (the "Handa Non-Compete Agreement"). As a result, some or all of Handa's defenses in the Handa Seroquel

---

[21] *AstraZeneca Pharm. LP v. Anchen Pharm., Inc.*, Civ. No. 10-cv-1835, 2012 WL 1065458, at *2 (D.N.J. Mar. 29, 2012).
[22] *Astrazeneca Pharm. LP v. Handa Pharm., LLC*, No. CIV.A. 08-3773 JAP, 2010 WL 4941431, at *3 (D.N.J. Nov. 30, 2010).

XR Patent Litigation were never adjudicated.

73.     On or about October 5, 2011, AstraZeneca reached a settlement with Accord resolving the Accord Seroquel XR Patent Litigation. As a result, on information and belief some or all of Accord's defenses in the Accord Seroquel XR Patent Litigation were never adjudicated.

74.     AstraZeneca did not settle with the Later-Filing Generics prior to the Later-Filer Seroquel XR Patent Litigation bench trial in October 2011. At the trial, three of the Later-Filing Generics – namely, Anchen, Osmotica, and Mylan – did not advance a non-infringement defense, in part because their generic version(s) of Seroquel XR used hydroxypropylmethylcellulose ("HPMC"), the "preferred gelling agent of the '437 patent":

> The proposed ANDA products of Anchen, Osmotica and Mylan Pharms contain HPMC, the preferred gelling agent of the '437 patent. Anchen, Mylan and Osmotica have not contested that their proposed ANDA products would infringe various claims of the '437 patent if those claims are not found to be invalid.[23]

75.     The generic Seroquel XR product of the fourth Later-Filing Generic—*i.e.*, Torrent—did not use HPMC but did use a "naturally-occurring hydrophilic polymer" sold under the brand name Viscarin 209 that "hydrates and swells in the presence of water."[24] The district court in the Later-Filer Seroquel XR Patent Litigation concluded that Viscarin 209 was indeed a "gelling agent" under the court's claim construction, and found that Torrent's generic Seroquel XR product infringed the '437 Patent.[25]

### E.     Handa's Unadjudicated Defenses Were Meritorious

76.     Unlike the Later-Filing Generics, Handa successfully designed around the '437 Patent by developing a non-infringing product that did not contain as "gelling agent" as required by each of the claims of the '437 Patent. Instead of using a hydrophilic "gelling agent," Handa's

---

[23] *See AstraZeneca Pharm. LP*, Civ. No. 10-cv-1835, 2012 WL 1065458, at *8.
[24] *Id.* at *11.
[25] *Id.* at *13.

products used the hydrophobic compound HVO. Each of the Later-Filing Generics, in contrast, used hydrophilic compounds that formed gels when placed in contact with water. As explained below, Handa obtained a patent on its novel formulation despite the '437 Patent, reflecting the determination of the United States Patent and Trademark Office ("PTO") that Handa's formulation was patentably distinct from the formulation claimed in the '437 Patent.

77.     On July 24, 2008, Handa filed United States Provisional Application No. 61/083,270 ("the '270 Application"). On September 5, 2008, Handa filed United States Application Serial No. 12/205,356 ("the '356 Application"), which claimed the benefit of the filing date of the '270 Application. On May 8, 2012, the '356 Application issued as United States Patent No. 8,173,637 ("the Handa '637A Patent"). On March 28, 2011, Handa filed United States Application Serial No. 13/073,873 ("the '873 Application"), which claimed the benefit of the filing date of the '356 and '270 Applications. On August 23, 2011, the '873 Application issued as United States Patent No. 8,003,637 ("the Handa '637B Patent").

78.     Handa disclosed the '288 and '437 Patents as prior art in the applications that led to the Handa '637A Patent and Handa '637B Patent. By issuing the Handa '637A Patent and Handa '637B Patent despite AstraZeneca's '288 and '479 Patents, the examiner necessarily determined that the claimed compositions in the Handa '637A Patent and in the Handa '637B Patent were patentably distinct from the compositions disclosed and claimed in AstraZeneca's '288 and '479 Patents.

79.     As Handa's own patents explain, HVO is a "hydrophobic" material that is "non-gelling":

> Examples of ***hydrophobic*** materials that can be used to form a ***non-gelling*** or non-swelling controlled release matrix for the atypical antipsychotic drug include beeswax, white wax, emulsifying wax, ***hydrogenated vegetable oil***, hydrogenated castor

oil, microcrystalline wax, cetyl alcohol, stearyl alcohol, free wax acids such as stearic acid, esters of wax acids, propylene glycol mono stearate, glycerol mono stearate, carnauba wax, palm wax, candelilla wax, lignite wax, ozokerite, ceresin wax, lardaceine, China wax and mixtures thereof. Other possible rate controlling excipients useful in the present invention include saturated hydrocarbons having from 25 to 31 carbon atoms, saturated alcohols having from 25 to 31 carbon atoms, saturated monocarboxylic acids having from 25 to 31 carbon atoms, esters obtained from said alcohols and monocarboxylic acids which are described in U.S. Pat. No. 6,923,984, incorporated herein by reference.[26]

80.    The district court's claim construction in the Seroquel XR Patent Litigation requires that, *inter alia*, the "gelling agent" interact with "water" to "form[] a gel" (*see supra*); accordingly, one of the important characteristics in determining whether a particular compound is a "gelling agent" is whether it is "hydrophilic" (*i.e.*, water loving) or "hydrophobic" (*i.e.*, water hating). This is so because "hydrophobic" compounds such as HVO generally do not interact with water. Indeed, the '437 Patent itself indicates that the claimed "gelling agent" must be "hydrophilic": "The term gelling agent as used herein means any substance, ***particularly a hydrophilic substance***, which forms a gel when in contact with water. . . ."[27]

81.    Although Handa settled before trial in the Seroquel XR Patent Litigation, evidence and arguments at the trial for the non-settling generics confirm that Handa's non-infringement defense would have prevailed at trial. In opening arguments, AstraZeneca's counsel focused on the fact that the Viscarin 209 in Torrent's product was "hydrophilic" and interacts substantially with water:

> Torrent does not use HPMC. Instead, Torrent uses a commercial carrageenan material called Viscarin GP209. Carrageenan, by way of background, is a naturally-occurring polymer, harvested from, believe it or not, seaweed, like FMC's Viscarin GP209 product is a hydrophilic, that is it's water loving, it hydrates and swells in the

---

[26] '637A Patent at 6:24-39 (emphasis added).
[27] '437 Patent at 2:43-45 (emphasis added).

presence of the water.[28]

82.    During the questioning of AstraZeneca's expert regarding Viscarin 209, the hydrophilicity of the compound was a focal point of the examination:

Q.    Can you explain what part of the '437 patent informs you what is contemplated by the word "gel"?

A.    Go back to the patent.

Q.    I believe it's tab four.

A.    Tab four. In the second column is yellow highlighted materials of the term "gelling agent" as used herein means a substance particularly a hydrophilic substance, which forms a gel when in contact with water and thus, includes such substances as, and it gives a long list of substances which are polymers. The gelling agent is preferably hydroxypropylmethylcellulose.

Q.    The patent states it's particularly a hydrophilic substance. Can you explain to the Court what a hydrophilic gelling agent is?

A.    Hydrophilic comes from hydro, water and philic, loves so it's a material that likes water, has intrinsic positive interaction with water, will tend to hydrate and swell.

Q.    So hydrophilic gelling agents will hydrate and swell?

A.    They will hydrate and swell. . . .

Q.    Now, Dr. Prud'homme, a moment ago when we were looking at the '437 patent, we saw it refers to the use of hydrophilic polymers as gelling agents.

Q.    Are carrageenans [*i.e.*, the compounds in Viscarin 209] hydrophilic polymers?

A.    Yes, they are.

Q.    And what happens to these hydrophilic carrageenan polymers when they come in contact with water?

A.    Well, they will tend to hydrate and swell. They also tend to gel.[29]

---

[28] Later-Filer Seroquel XR Patent Litigation Trial Transcript (Oct. 3, 2011) at 8.

This questioning, like the text in the '437 Patent itself and AstraZeneca's opening argument, highlight why a hydrophobic compound like the HVO in Handa's products was very unlikely to be found to be a "gelling agent" as required by the claims of the '437 Patent. Furthermore, HVO could not have satisfied the requirement for a "gelling agent" under the doctrine of equivalents because HVO is substantially different from the claimed "gelling agent" and further does not satisfy the doctrine of equivalents' function-way-result test.

83.     Had Handa not settled with AstraZeneca, Handa would have prevailed on its non-infringement defense. On information and belief, Handa also had other meritorious defenses.

**F.      AstraZeneca Enters into Unlawful Reverse-Payment Agreements with Handa and Accord**

84.     On or about September 29, 2011, AstraZeneca and Handa entered into the Handa Non-Compete Agreement.[30] On or about October 5, 2011, AstraZeneca and Accord entered into the Accord Non-Compete Agreement.[31]

85.     Under the terms of the Non-Compete Agreements, Handa and Accord respectively agreed to quit their patent fights and delay their respective generic Seroquel XR launches until November 1, 2016.  In exchange for Handa's and Accord's agreements to delay launching, AstraZeneca agreed not to compete with Handa or Accord by launching an authorized generic for the first six months after their launches, *i.e.*, AstraZeneca agreed not to launch an authorized generic until May 1, 2017.

---

[29] *Id*. (Oct. 3, 2011) at 74:7-79:25.

[30] *US District Court Finds SEROQUEL XR Formulation Patent Valid and Infringed*, https://www.businesswire.com/news/home/20120329006628/en/District-Court-Finds-SEROQUEL-XR-Formulation-Patent (March 29, 2012) ("On September 29, 2011, AstraZeneca granted Handa a license to the 5,948,437 patent effective November 1, 2016, or earlier under certain circumstances.").

[31] *AstraZeneca enters into a settlement agreement with Accord Healthcare, Inc. and Intas Pharmaceuticals Ltd regarding US SEROQUEL XR® patent litigation* (Oct. 5, 2011), https://www.astrazeneca.com/media-centre/press-releases/2011/AstraZeneca-enters-into-a-settlement-agreement-with-Accord-Healthcare-Inc-and-Intas-Pharmaceuticals-Ltd-regarding-US-SEROQUEL-XR-patent-litigation-05102011.html#modal-historic-confirmation.

86. The purpose and effect of the Non-Compete Agreements was to prevent AstraZeneca from facing lower-priced generic competition for up to five years and to allow Handa and Accord to sell generic Seroquel XR without competition from authorized generic Seroquel XR for six months after Handa's and Accord's November 1, 2016 generic Seroquel launches, from November 1, 2016 through April 30, 2017.

87. On October 29, 2012, Par announced that it had acquired Handa's ANDA No. 90-482. As part of Par's acquisition of Handa's ANDA, Handa assigned the Handa Non-Compete Agreement to Par.[32] As explained above, Par became an active participant and co-conspirator in the pre-existing conspiracy between Handa and AstraZeneca and is jointly and severally liable for all harm flowing from the conspiracy: a press release Handa issued on May 10, 2017 stated that, under its agreement with Par, "Par's Quetiapine XR ANDA was developed by Handa and acquired by Par on August 3, 2012. Handa retains the right to a portion of profits from the sale of the product, pursuant to its agreement with Par."[33]

88. AstraZeneca always intended to launch an authorized generic to compete with Handa/Par's and Accord's generic Seroquel XR products, as evident from the fact that

---

[32] *Par Pharmaceutical Acquires Rights to Market and Distribute Generic Seroquel XR® in the U.S.* (Oct. 29, 2012), https://www.prnewswire.com/news-releases/par-pharmaceutical-acquires-rights-to-market-and-distribute-generic-seroquel-xr-in-the-us-176239031.html (Par "entered into an exclusive acquisition and license agreement with Handa Pharmaceuticals, LLC to acquire Handa's Abbreviated New Drug Application (ANDA) for quetiapine fumarate extended-release tablets, the generic version of AstraZeneca's Seroquel XR®. Handa believes it is the first applicant to file an ANDA containing a paragraph IV certification for the 50 mg, 150 mg, 200 mg and 300 mg strengths of the product, which would potentially provide 180 days of marketing exclusivity . . . . Under the terms of the agreement, Par has made a payment for the ANDA and for exclusive rights to market, sell and distribute quetiapine fumarate extended release tablets in the U.S. under the ANDA, subject to its final approval by the U.S. Food and Drug Administration. Par will receive a share of profits from the sales of the product. Under the terms of a prior settlement agreement with AstraZeneca, which has been assigned to Par, Par has a license to enter the U.S. market with quetiapine fumarate extended-release tablets on November 1, 2016 or earlier under certain circumstances.")

[33] *Handa Pharmaceuticals, Inc. Announces FDA Approval for Generic Version of AstraZeneca's SEROQUEL XR® Extended Release Tablets* (May 10, 2017), https://handapharma.com/handa-pharmaceuticals-inc-announces-fdaapproval-for-generic-version-of-astrazenecas-seroquel-xr-extended-release-tablets/.

AstraZeneca actually did so on the first day it was allowed to under the terms of the Non-Compete Agreements.[34] But for the Non-Compete Agreements, AstraZeneca would have launched authorized generic Seroquel XR at the time that Handa/Par and Accord launched, and competed for generic Seroquel XR sales during Handa/Par's and Accord's 180-day exclusivity periods. Instead, because of the Non-Compete Agreements, AstraZeneca waited 180 days after Handa/Par's and Accord's generic Seroquel XR launches to launch competitive authorized generic Seroquel XR.

89. Accord received FDA tentative approval for its ANDA No. 90-0681 on December 14, 2010 and final approval on November 1, 2016.[35] On information and belief, Accord's 400mg generic Seroquel XR product would have received final approval before November 1, 2016 absent the Accord Non-Compete Agreement.

90. Handa received tentative approval from FDA on December 9, 2010.[36] Par obtained final FDA approval for ANDA No. 90-482 on May 9, 2017, almost exactly the end of its 180-day exclusivity period.[37] On information and belief, absent the Handa Non-Compete Agreement, Handa/Par's 50mg, 150mg, 200mg and 300mg strengths of generic Seroquel XR would have received final FDA approval before November 1, 2016.

91. Handa's and Accord's tentative FDA approvals meant that their ANDAs were

---

[34] DailyMed, Label: Quetiapine Fumarate Extended Release, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=7283b14f-023d-466f-a7eb-4356803d7c65&audience=consumer (displaying AstraZeneca launch date as May 1, 2017 for "NDA Authorized Generic").

[35] See Final Approval Letter from Carol Holquist Deputy Director, Office of Regulatory Operations, FDA, to Sabita Nair, Senior Director, Regulatory Affairs, Accord Healthcare Inc. (Nov. 1, 2016), https://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2016/090681Orig1s000TAltr.pdf.

[36] See Tentative Approval Letter from Keith Webber, Deputy Director Office of Pharm. Science, FDA, to Maggie Chang, Executive Vice President, Quality Affairs, Handa Pharm., LLC, at 1, at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2010/090482s000ltr.pdf.

[37] Handa Pharmaceuticals, Inc. Announces FDA Approval for Generic Version of AstraZeneca's SEROQUEL XR® Extended Release Tablets (May 10, 2017), https://handapharma.com/handa-pharmaceuticals-inc-announces-fda- approval-for-generic-version-of-astrazenecas-seroquel-xr-extended-release-tablets/.

ready for FDA final approval but for the existence of a patent or regulatory barrier.

92.     On information and belief, AstraZeneca provided Handa/Par and Accord with licenses under its '437 Patent, and reverse payments in the form of agreements not to launch authorized generic versions of Handa/Par's and Accord's respective strengths of generic Seroquel XR ("no-AG provisions" or "no-AG promises"). AstraZeneca was motivated to make these reverse payments because it was a preferable alternative to AstraZeneca than risking an adverse ruling on its patent, which would have caused earlier generic Seroquel XR entry.

93.     But-for the Non-Compete Agreements, Par/Handa and Accord would have been ready, able, and willing to launch their respective strengths of generic Seroquel XR much earlier. Handa/Par's and Accord's generic Seroquel XR products would have received final approval from FDA upon (1) the conclusion of the 30-month stays; (2) litigation victory by Handa/Par and Accord earlier than November 1, 2016; or (3) a licensed generic Seroquel XR entry date earlier than November 1, 2016 pursuant to agreement(s) with AstraZeneca that did not include unlawful reverse payments from AstraZeneca to induce delay.[38]

94.     By on or about September 29, 2011, when the Handa Non-Compete Agreement was executed, Seroquel XR was generating nearly a billion dollars per year in revenues for AstraZeneca. Losing a substantial portion of that revenue stream in the event Handa and/or Accord were to prevail on non-infringement or other defenses—or in the event that AstraZeneca had not induced Handa and/or Accord with reverse payments to agree to delay launching generic Seroquel XR for 5 years—would have drastically reduced AstraZeneca's profits. Thus, AstraZeneca had enormous incentives to avoid competition from Handa and Accord by entering

---

[38] *See, e.g.*, *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 405 (3d Cir. 2015) ("when the parties' settlement includes a [payment], the generic also presumably agrees to an early entry date that is later than it would have otherwise accepted."); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d at 751-52 (a reverse payment "is likely to induce the generic to agree to enter the market at a date later than that to which it would otherwise agree").

into the Non-Compete Agreements.

95. On information and belief, the Non-Compete Agreements contained confidentiality provisions precluding the parties to those agreements from disclosing the key terms of the Non-Compete Agreements, including AstraZeneca's covenants not to launch an authorized generic of Seroquel XR during Handa/Par's and Accord's 180-day exclusivity periods to compete with Handa/Par and Accord (the no-AG provisions). Although the parties subsequently made vague public references to their Non-Compete Agreements, they concealed the agreements' anticompetitive purpose and terms. No public reference to the Non-Compete Agreements disclosed that AstraZeneca agreed not to compete with an authorized generic during Handa/Par's or Accord's 180-day exclusivity periods.

96. Nor did the parties' disclosures admit that the Non-Compete Agreements each included an agreed-upon, anticompetitive, no-authorized-generic provision as a *payment* from AstraZeneca to Handa/Par and to Accord in order to induce Handa/Par and Accord to delay generic Seroquel XR entry until November 1, 2016. Plaintiff lacked sufficient indication of any *quid pro quo* until AstraZeneca actually launched its authorized generic Seroquel XR on May 1, 2017, immediately after Handa/Par's and Accord's 180-day exclusivity periods ended. Until that time, it was not knowable that Handa/Par's and Accord's generic Seroquel XR entry dates were affected (delayed) by payments (AstraZeneca's no-authorized generic promises). This was a deliberate concealment.

97. On November 1, 2016, Par began selling 50mg, 150mg, 200mg, 300mg generic Seroquel XR and Accord began selling 400mg generic Seroquel XR.[39]

98. On May 1, 2017 (180 days later), AstraZeneca launched authorized generic

---

[39] *See, e.g.*, OptumRx, Seroquel XR (quetiapine) – First Time Generic, https://professionals.optumrx.com/content/dam/optum3/professional-optumrx/news/rxnews/newgenerics/newgenerics_seroquelxr_2016-1102.pdf.

versions of Seroquel XR in the 50mg, 150mg, 200mg, 300mg, and 400mg strengths.[40]

99.     Several other generic competitors launched their own versions of generic Seroquel XR, in all strengths, in or around early May 2017.

100.     Because of Handa and Accord's Non-Compete Agreements no generic Seroquel XR was available for Direct Purchasers to buy in the United States until November 1, 2016 and, for a period of six months after, there was only one generic available for each strength of Seroquel XR, marketed by Par in the 50mg, 150mg, 200mg, and 300mg strengths and by Accord in the 400mg strength.

101.     AstraZeneca's waiting to launch authorized generic Seroquel XR until Handa/Par's and Accord's 180-day exclusivities expired did not make economic sense. It would have been more lucrative for AstraZeneca to have simply launched authorized generic Seroquel XR immediately upon Handa/Par's and Accord's launches. AstraZeneca only agreed to delay its authorized generic launch until May 1, 2017, 180 days after Handa/Par and Accord launched generic Seroquel XR, as a *quid pro quo* for Handa/Par's and Accord's respective agreements to delay generic Seroquel XR competition until November 1, 2016. As explained below, Plaintiff were not on notice of AstraZeneca's large reverse payments to Handa/Par and to Accord until at least the time when it became clear that AstraZeneca took the plainly irrational path of delaying its corresponding authorized generic Seroquel XR launch.

102.     On information and belief, as consideration for Handa/Par's and Accord's agreement to forgo selling generic extended-release quetiapine fumarate in competition with AstraZeneca's branded Seroquel XR for up to five years, AstraZeneca agreed to share with Handa/Par and Accord the monopoly profits from sales of branded Seroquel XR in the form of

---

[40] *See* DailyMed, Label: Quetiapine Fumarate Extended Release, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=7283b14f-023d-466f-a7eb-4356803d7c65&audience=consumer (showing AstraZeneca with a May 1, 2017 launch date as an "NDA Authorized Generic").

covenants not to compete with Handa/Par's and Accord's generics with authorized generic Seroquel XR. Instead of competing, which would have resulted in lower prices of both generic and branded Seroquel XR, AstraZeneca agreed and conspired with Handa/Par and with Accord to maintain the prices of extended-release quetiapine fumarate at supracompetitive levels.

103.    The Non-Compete Agreements benefitted Handa/Par and Accord by guaranteeing that they would be the sole generic seller on the market for their respective strengths during their 180-day exclusivity periods, which significantly increased Handa/Par's and Accord's anticipated sales revenues during their exclusivity periods because: (1) Handa/Par and Accord would capture all of the sales that would otherwise have gone to competing authorized generic Seroquel XR, and (2) Handa/Par and Accord would be able to charge significantly higher prices for their generic Seroquel XR products without price competition from competing authorized generic Seroquel XR.

104.    A brand company's launch of a competing authorized generic is extremely costly to any first-filer generic, such as Handa/Par and Accord, because the authorized generic erodes the first-filer's share of the overall generic volume *and* pushes down generic prices. The authorized generic also cuts into the first-filer's long-term "first mover advantage," *i.e.*, the continuing market advantage that can accrue to the first entrant. As the FTC noted in a June 2009 report on authorized generics, "consumers benefit and the healthcare system saves money during the 180-day exclusivity period when an [authorized generic] enters the market, due to the greater discounting that accompanies the added competition provided by the [authorized generic]."[41]

---

[41] Fed. Trade Comm'n, *Authorized Generic Drugs: Short-Term and Long-Term Impact* at ii, https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (quoting Fed. Trade Comm'n, Authorized Generics: An Interim Report (2009), http://www.ftc.gov/os/2009/06/P062105 authorizedgenericsreport.pdf.).

Thus, AstraZeneca's covenants not to launch authorized generic Seroquel XR during Handa/Par's and Accord's exclusivity periods were extremely valuable to Handa/Par and Accord.

105.    Relatedly, AstraZeneca sacrificed large profits through its agreements not to launch authorized generics of Handa/Par's and Accord's respective strengths of generic Seroquel XR. Absent the unlawful Non-Compete Agreements, it would make economic sense for AstraZeneca to launch authorized generics during Handa/Par's and Accord's 180-day marketing exclusivity periods so that AstraZeneca would retain 50% of the sales that Handa/Par's and Accord's less expensive generics otherwise would otherwise capture.

106.    As alleged above, an authorized generic typically captures approximately 50% of the generic unit sales during the first 180-days of generic marketing. Thus, AstraZeneca's promise to not launch an authorized generic Seroquel XR (the no-AG provision) constituted very large payments to Handa/Par and Accord.

107.    Specifically, U.S. sales of Seroquel XR for the four dosage strengths for which Par was the first-filer (the 50mg, 150mg, 200mg and 300mg strengths) were, and were expected to be, approximately $911 million for the 12 months ending September 30, 2016.[42] Thus Defendants could assume that 6 months (or half a year) of brand sales (the duration of AstraZeneca's covenant not to launch an authorized generic) would generate revenue of approximately $455.5 million (half of AstraZeneca's $911 million in annual Seroquel XR revenue).

108.    As is common in the pharmaceutical industry, the generic is expected to take 80% (or more) of the brand sales over the first six months following generic entry. Thus,

---

[42] Handa Pharmaceuticals Announces Endo Begins Shipping Generic Version of AstraZeneca's SEROQUEL XR® (Nov. 1, 2016), https://handapharma.com/announcement-for-generic-shipment/.

approximately $364.4 million worth of brand sales would be converted to the generic ($455.5 million * 0.8) during the period of Handa/Par's 180-day exclusivity (the duration of AstraZeneca's covenant not to launch an authorized generic). As is also common, with only one generic on the market, the generic is typically priced at 90% of the brand, which would result in generic sales of approximately $327.96 million ($364.4 million * 0.9). Thus, the generic Seroquel XR sales revenue that would have reasonably been anticipated by Handa/Par during the 180-day exclusivity period without competition from an AG would be approximately $327.96 million.

109.     Handa/Par's expectations would have differed dramatically if AstraZeneca had not promised to refrain from competing with authorized generic Seroquel XR. According to an FDA study of the effects of additional generic competitors on the generic price, the entry of a second generic drives the average generic price down to 54% of the brand price.[43] Thus, while the generics would still take 80% of six months of brand sales, or $364.4 million, the generic sales value would drop to $189.488 million ($364.4 million * 0.52). And, it would reasonably be expected that those sales would be split evenly (50% / 50%) between Handa/Par and AstraZeneca's authorized generic.[44] Thus, without the no-AG promise in the Handa Non-Compete Agreement, Handa/Par's sales of generic Seroquel XR during the first 6 months would be expected to be approximately $94.744 million ($189.488 million * 0.5).

---

[43] U.S. Food & Drug Admin., New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices (Dec. 13, 2019), https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/generic-competition-and-drug-prices.

[44] Fed. Trade Comm'n, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at vi, https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf (The Federal Trade Commission has concluded that, when free from competition from an authorized generic, "the first-filer's revenue will approximately double" during the first six months of generic competition, compared to what the first filer would make if it faced authorized generic competition.).

110.     As a result, the expected value at the time of the Handa Non-Compete Agreement to Handa/Par of the no-AG provision versus facing competition from an AG would have been as much as approximately $233.216 million, the difference between the amount Handa/Par would reasonably expect to earn as the only generic seller on the market for 180 days following launch and the amount it would reasonably expect to earn if it faced competition from an AG during this 180-day period ($327.96 million - $94.744 million). Thus, AstraZeneca's agreement to not launch an AG for 6 months following Handa/Par's generic launch was a payment to Handa/Par of as much as approximately $233.216 million. The value of this payment to Handa/Par was tantamount to AstraZeneca handing this amount to Handa/Par in cash.

111.     The same math and reasoning applies to Accord. Specifically, in exchange for Accord's commitment to not launch its generic version of 400mg strength Seroquel XR until November 1, 2016, AstraZeneca promised Accord that it would not launch an authorized generic version of 400mg strength Seroquel XR until May 1, 2017. AstraZeneca's sales of the 400mg strength of Seroquel XR in 2015 (the last full calendar year before generic Seroquel XR entry) were, and were expected to be, approximately $421 million. Using the same math as used for Handa/Par, the promise from AstraZeneca to Accord to not compete during Accord's 180-day exclusivity period was worth approximately $107.78 million.[45]

112.     AstraZeneca often competes with first-filers by launching authorized generics. The FTC has found that, in the time period from 2001 to 2008, only four companies launched more authorized generics than AstraZeneca:[46]

---

[45] Specifically, Accord's revenues without facing an AG would be expected to be $421 million * .5 * .8 * .9, or $151.56 million. Accord's revenues if it competed with an AG would be expected to be $421 million * .5 * .8 * .52 * .5, or $43.78 million. The difference is $107.78 million ($151.56 million - $43.78 million).

[46] Fed. Trade Comm'n, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* at 16 (Aug. 2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-



Figure 2-2: Number of Authorized Generic Drugs per NDA-Holding Company

113.    On information and belief, AstraZeneca has launched authorized generics with respect to at least the following branded drugs: Accolate, Toprol-XL, Novaldex, Entocort EC, Pulmicort, Atacand, Plendil, Prilosec, and Nexium.

114.    It is economically rational for a brand manufacturer that intends to compete for generic sales by launching an authorized generic to do so contemporaneously with the first ANDA filer's launch. This is because, during the first-filer's 180-day exclusivity, the only possible competitors for generic sales are the first-filer and the brand's authorized generic. No later-filing generic can launch during this time. As the Third Circuit Court of Appeals has

term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("For each company, the graph includes all AGs marketed pursuant to the company's NDAs, whether marketed internally (e.g., by a subsidiary), or through an external generic partner.").

observed, "Absent a no-AG promise, launching an authorized generic would seem to be economically rational for the brand." *King Drug Co. of Florence, Inc.*, 791 F.3d at 405.

115.    Thus, it would have been economically rational for AstraZeneca to have launched authorized generic Seroquel XR contemporaneously with market entry by Handa/Par and Accord instead of *after* Handa/Par's and Accord's 180-day exclusivity periods. In the absence of the anticompetitive Non-Compete Agreements, AstraZeneca would have done so. Specifically, absent the Handa Non-Compete Agreement, AstraZeneca would have launched authorized generic Seroquel XR in the 50mg, 150mg, 200mg and 300mg strengths contemporaneous with Handa/Par's launch of generic Seroquel SR in these same strengths. Absent the Accord Non-Compete Agreement, AstraZeneca would have launched authorized generic Seroquel XR in the 400mg strength contemporaneous with Accord's launch of generic Seroquel XR in the 400mg strength.

116.    Conversely, if there were no agreements preventing AstraZeneca from launching immediately upon Handa/Par's and Accord's launches, then AstraZeneca's waiting until Handa/Par's and Accord's 180-day exclusivity periods expired to launch authorized generic Seroquel XR was economically irrational. This is because there was no economically rational reason for AstraZeneca to forgo its AG Seroquel XR launches and competition with Handa/Par and Accord during Handa/Par's and Accord's 180-day exclusivity periods. During the 180-day exclusivity period, AstraZeneca was permitted to launch an authorized generic which would only have to compete with a single generic competitor in each strength. But after expiry of Handa/Par's and Accord's 180-day exclusivity periods, other generics could and would launch and AstraZeneca's AG would have to compete with those other generics too. Thus, it only made sense for AstraZeneca to forgo its authorized generic launch during Handa/Par's and Accord's

180-day exclusivity periods as part of anticompetitive market-allocation or output-restriction agreements to compensate Handa/Par and Accord for delaying generic Seroquel XR competition.

117. The payments flowing from AstraZeneca to Handa/Par and to Accord via the Non-Compete Agreements' no-AG provisions had a cash value of as much as approximately $233.216 million to Handa/Par and $107.78 million to Accord. AstraZeneca intended that these payments would induce Handa/Par and Accord to stay out of the market for Seroquel XR and its generic equivalents in return for sharing monopoly profits, a naked market allocation or output restriction agreement and thus a *per se* violation of the Sherman Act. But even under the rule of reason, the reverse payments from AstraZeneca to Handa/Par and Accord are unjustified, and Defendants had no procompetitive justification or other legitimate explanation for the payments. It is well established that there is no conceivable procompetitive justification for a covenant to delay the launch of authorized generics.

118. Absent AstraZeneca's unlawful reverse payments to Handa/Par and Accord, any agreement resolving AstraZeneca's patent infringement claim would have resulted in far less (or no) delay of Handa/Par's and Accord's generic Seroquel XR entry, generic competition would have been more robust, and generic prices would have been lower. But for the Non-Compete Agreements, Handa/Par and Accord would have launched their respective strengths of generic Seroquel XR earlier: at risk, following a patent litigation victory, or pursuant to a negotiated entry date as part of an agreement that did not include reverse payments.[47] At the same time, AstraZeneca would have competed for generic Seroquel XR sales by immediately launching authorized generic Seroquel XR instead of waiting to launch its authorized generic Seroquel XR

---

[47] The Supreme Court stated that brand and generic companies can settle without reverse payments. *Actavis*, 133 S. Ct. at 2237 ("They may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point.").

for 6 months following Handa/Par's and Accord's generic launches.

119. On information and belief and based on the fact that several Later-Filing Generics actually launched 180 days after Handa/Par and Accord, several other Later-Filing Generics had agreements with AstraZeneca that permitted entry upon Handa/Par's and Accord's launch, subject to Handa/Par's and Accord's 180-day exclusivity periods. Had Handa/Par and Accord launched their respective strengths of generic Seroquel XR earlier, those Later-Filing Generics would have launched earlier as well. But for the bottleneck of generic competition caused by the Non-Compete Agreements, and more specifically by those agreements' foreseeable and intentional effect of causing Handa/Par's and Accord's 180-day exclusivity periods to remain untriggered and thus unelapsed for up to five additional years, until November 1, 2016, one or more Later-Filing Generics, would have launched earlier, along with Handa/Par's generic, Accord's generic, and the authorized generic, lowering generic Seroquel XR prices further still.

120. The reason that Handa/Par and Accord did not launch earlier than November 1, 2016 had nothing whatsoever to do with any purported infringement risk flowing from the '437 Patent. Rather, Handa/Par's and Accord's generic launches were delayed by the anticompetitive Non-Compete Agreements, just as Defendants understood and intended. In addition, Handa/Par and Accord, as the first ANDA filers for their respective strengths, had 180 days of regulatory exclusivity for those strengths during which no subsequent filer could launch an ANDA version of Seroquel XR. Thus, Handa/Par, Accord and AstraZeneca all recognized that delaying Handa/Par's and Accord's generic launches in exchange for no-AG covenants would benefit each of them. AstraZeneca would benefit by continuing to charge monopoly prices for Seroquel XR almost until the '437 Patent's expiry despite the weakness of the '437 Patent. This is because Handa and Accord were willing to be paid to delay their generic launches, and Handa/Par's and

Accord's delay would delay the triggering, and thus the elapsing, of the Handa/Par's and Accord's 180-day exclusivity periods, thereby bottlenecking all generic Seroquel XR competition. Handa/Par and Accord benefitted by securing no-AG promises allowing them to be free from AG competition for the first six months after their delayed generic Seroquel XR launches.

121. According to information available publicly through the FDA, in addition to first- filers Handa/Par and Accord, at least 12 additional companies filed ANDAs to sell generic Seroquel XR:

| Application No. | Company |
|---|---|
| 209497 | Alignscience Pharma Inc. |
| 090757 | Anchen |
| 207655 | Aurobindo Pharma Ltd. |
| 202939 | IntellipharmaCeutics Corp. |
| 204203 | Lupin Ltd. |
| 204253 | Macleods Pharmaceuticals Ltd. |
| 202228 | Mylan |
| 208947 | Novast Laboratories |
| 201424 | Osmotica |
| 206260 | Pharmadax Inc. |
| 209635 | Sciegen Pharmaceuticals Inc. |
| 202377 | Torrent |

122. According to information available publicly through the FDA, many of these entities received final approval on or around the end of Handa/Par's and Accord's actual 180-day exclusivity periods. These included Pharmadax Inc., IntellipharmaCeutics Corp., Accord (as to the 150mg, 200mg and 300mg strengths), Par (as to the 400mg strength) and Lupin Ltd. These approvals would have been granted earlier if Handa/Par's and Accord's 180-day exclusivity periods had been triggered (and elapsed) earlier as a result of Handa/Par and Accord launching generic Seroquel XR earlier, which would have occurred absent AstraZeneca's payments to

Handa/Par and to Accord to delay competition (*i.e.*, absent AstraZeneca's no-AG promises).

123.    But for the Defendants' ongoing performance under the Non-Compete Agreements, generic competition for Seroquel XR, including competition from authorized generic Seroquel XR, would have occurred earlier, and prices for extended-release quetiapine fumarate would have been lower. But for Defendants' ongoing, illegal anticompetitive conduct, generic versions of Seroquel XR would have become available much earlier – either through a Handa and/or Accord patent victory, at-risk launch, or agreement(s) that did not include unlawful payments for delay. Plaintiff and other members of the Class would have paid lower prices for Seroquel XR and its generic equivalents. Defendants, by their conduct, have injured Plaintiff and other members of the Class by causing them to pay millions of dollars in overcharges on their purchases of extended-release quetiapine fumarate.

## VII.    DEFENDANTS' ACTIONS IMPACT INTERSTATE TRADE AND COMMERCE

124.    During the Class Period, AstraZeneca, Par and Accord manufactured, promoted, distributed, and/or sold brand and/or generic Seroquel XR in a continuous and uninterrupted flow of commerce throughout the United States, including through and into this District. During the Class Period, in connection with the purchase and sale of brand and/or generic Seroquel XR, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

125.    The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

126.    During the Class Period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as alleged were within the flow of,

and have substantially affected, interstate commerce.

127.    Defendants' conduct, including the manufacture, marketing, distribution, and sale of Seroquel XR has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

128.    The monopolization and conspiracy alleged in this Complaint has directly and substantially affected interstate commerce as Defendants deprived Plaintiff and Members of the Direct Purchaser Class of the benefits of free and open competition in the purchase of Seroquel XR within the United States.

129.    Defendant's anticompetitive scheme of monopolization, contract in restraint of trade, and conspiracy to monopolize was to inflate, fix, raise, maintain, or artificially stabilize prices of Seroquel XR, and its actual inflating, fixing, raising, maintaining, or artificially stabilizing Seroquel XR prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States and on import trade and commerce with foreign nations.

## VIII.    ASTRAZENECA HELD MARKET POWER FOR SEROQUEL XR

130.    The relevant geographic market is the United States and its territories and possessions.  At all relevant times before November 1, 2016, AstraZeneca held 100% of the market for Seroquel XR and its AB-rated generic equivalents.

131.    AstraZeneca had continuous monopoly power in the market for Seroquel XR and its AB-rated generic equivalents because it had the power to maintain the price of Seroquel XR at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as Seroquel XR, such as AB-rated generic quetiapine fumarate products.  AstraZeneca's market power may be shown through direct evidence, including, for

example, the abnormally-high price-cost margins AstraZeneca had before the entry of AB-equivalent generic Seroquel XR and AstraZeneca's profitably maintaining the price of Seroquel XR well above competitive prices. Therefore, defining the relevant market is not required.

132. AstraZeneca held monopoly power from the grant of the '437 Patent in 1999 until the entry of AB-rated generic equivalents entered the market on November 1, 2016.

133. Other drugs that are not AB-rated to Seroquel XR cannot be substituted automatically for Seroquel XR by pharmacists, do not exhibit substantial cross-price elasticity of demand with Seroquel XR, and thus are not economic substitutes for, nor reasonably interchangeable with, Seroquel XR.

134. Manufacturers attempt to differentiate brand name drugs like Seroquel XR based on features and benefits, such as safety and efficacy, rather than on price. Doctors and patients generally do not consider price when prescribing and taking prescription drugs like Seroquel XR because insurance bears much of the cost of prescriptions, in addition to other institutional features of the pharmaceutical marketplace. Different patients may respond differently to different drugs; even drugs within Seroquel XR's same therapeutic class do not constrain the price of Seroquel XR.

135. There are no practical substitutes for Seroquel XR or its AB-rated generic equivalents. Functional similarities between Seroquel XR and other products designed to treat major depressive disorder, bipolar disorder, and schizophrenia, other than AB-rated generic equivalents of Seroquel XR, are insufficient to permit inclusion of those other drug products in the relevant market with Seroquel XR. On information and belief, AstraZeneca has never lowered the price of Seroquel XR in response to the pricing of other branded or generic drugs.

136. AstraZeneca needed to control only the sales of Seroquel XR and its AB-rated

generic equivalents, and no other products, in order to maintain the price of Seroquel XR profitably at supracompetitive prices. Only the market entry of a competing, AB-rated generic version of Seroquel XR would render AstraZeneca unable to maintain the prices of Seroquel XR without losing substantial sales.

137.    AstraZeneca's anticompetitive reverse payments to Handa/Par and to Accord demonstrate that AstraZeneca enjoyed market and/or monopoly power with respect to extended-release quetiapine fumarate tablets.

138.    A small but significant non-transitory price increase above the competitive level for Seroquel XR by AstraZeneca would not cause a loss of sales sufficient to make the price increase unprofitable.

139.    At competitive price levels, Seroquel XR does not exhibit significant positive cross-price elasticity of demand with any product other than AB-rated generic Seroquel XR.

140.    AstraZeneca, as described herein, has enjoyed high barriers to entry with respect to competition to the above-defined relevant product market due to patent enforcement, regulatory bars to FDA approval of AB-rated generic competitors, and high costs of market entry and expansion.

141.    During the Class Period, Defendants' anticompetitive conduct as resulted in restrained competition for the sale of Seroquel XR in the United States.

142.    AstraZeneca has exercised its monopoly power to exclude and restrict competition to Seroquel XR and its AB-rated generic equivalents. AstraZeneca sold Seroquel XR at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins.

143.    Defendants' anticompetitive scheme has significantly damaged competition and

consumers through a reduction of output and higher prices caused by an elimination or reduction of lower cost AB-rated generic Seroquel XR throughout the United States.

144.　To the extent Plaintiff is legally required to prove monopoly power through circumstantial evidence by first defining a relevant product market, Plaintiff alleges that the relevant market is Seroquel XR, in all its forms and dosage strengths, and AB-rated generic versions of Seroquel XR, in all their forms and dosage strengths. The relevant geographic market is the United States.

## IX.　DEFENDANTS' VIOLATIONS OF THE ANTITRUST LAWS

145.　The Non-Compete Agreements enabled Defendants to:

(a)　prevent and delay until November 1, 2016 the entry of less-expensive generic versions of Seroquel XR products in the United States;

(b)　fix, raise, maintain, or stabilize the price of Seroquel XR products;

(c)　allocate to AstraZeneca 100% of the U.S. market for Seroquel XR and its generic equivalents until November 1, 2016;

(d)　allocate to Handa/Par 100% of U.S. sales of the 50mg, 150mg, 200mg, and 300mg strengths of generic Seroquel XR from November 1, 2016 through April 30, 2017; and

(e)　allocate to Accord 100% of U.S. sales of the 400mg strength of generic Seroquel XR from November 1, 2016 through April 30, 2017.

146.　Par launched generic 50mg, 150mg, 200mg, and 300mg strengths of Seroquel XR on November 1, 2016, thereby triggering its 180-day exclusivity period as to those strengths of generic Seroquel XR. Accord launched a generic version of the 400mg strength of Seroquel XR that same day, on November 1, 2016, thereby triggering its 180-day exclusivity period as to the 400mg strength of generic Seroquel XR. At least three Later-Filing Generics received final approval on or about May 9, 2017, shortly following the expiry of Par's and Accord's 180-day

exclusivity periods.[48] AstraZeneca launched authorized generic Seroquel XR for all strengths (50mg, 150mg, 200mg, 300mg, and 400mg) at around the same time.[49]

147.    As described herein, during the Class Period, Plaintiff and Members of the Direct Purchaser Class directly purchased Seroquel XR from Defendants. As a result of the Defendants' anticompetitive conduct, Plaintiff and Members of the proposed Direct Purchaser Class paid more for Seroquel XR than they would have and thus suffered substantial damages. Plaintiff and Members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

148.    But for the unlawful Handa Non-Compete Agreement, Handa/Par would have begun selling a less expensive generic version of the 50mg, 150mg, 200mg and 300mg strengths of Seroquel XR much earlier than November 1, 2016. Such sales would have occurred via market entry by Handa/Par upon a Handa/Par litigation victory, at risk, or via a licensed entry in a settlement with AstraZeneca that did not include a no-AG provision or any other unlawful reverse payments from AstraZeneca to Handa/Par. In addition, contemporaneously with market entry by Handa/Par, AstraZeneca would have begun selling lower-priced authorized generic Seroquel XR in the 50mg, 150mg, 200mg and 300mg strengths in direct competition with the Handa/Par's generic. Other generic manufacturers would have launched generic Seroquel XR in the 50mg, 150mg, 200mg and 300mg strengths approximately 180 days after Handa/Par's

---

[48] *Handa Pharmaceuticals, Inc. Announces FDA Approval for Generic Version of AstraZeneca's SEROQUEL XR® Extended Release Tablets*, https://handapharma.com/handa-pharmaceuticals-inc-announces-fda-approval-for-generic-version-of-astrazenecas-seroquel-xr-extended-release-tablets/.

[49] *Id. See also* DailyMed, *Label: Quetiapine Fumarate Extended Release*, https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=7283b14f-023d-466f-a7eb-4356803d7c65&audience=consumer (showing AstraZeneca with a May 1, 2017 launch date as an "NDA Authorized Generic"). Handa/Par's generic. Other generic manufacturers would have launched generic Seroquel XR in the 50mg, 150mg, 200mg and 300mg strengths approximately 180 days after Handa/Par's launch.

launch.

149.     Similarly, but for the illegal Accord Non-Compete Agreement, Accord would have begun selling a lower-price generic version of Seroquel XR in the 400mg strength earlier than November 1, 2016. Such sales would have occurred via market entry by Accord following a litigation victory, at-risk, or via a licensed entry in a settlement with AstraZeneca that did not include a no-AG provision or any other unlawful reverse payments from AstraZeneca to Accord. In addition, contemporaneously with market entry by Accord, AstraZeneca would have begun selling lower-priced authorized generic Seroquel XR in the 400mg strength in direct competition with Accord's generic. Other generic manufacturers would have launched generic Seroquel XR in the 400mg strength approximately 180 days after Accord's generic launch.

150.     An increasingly competitive market for Seroquel XR and its AB-rated generic equivalents, with lower prices, would have thereafter emerged as additional generic Seroquel XR products entered the market.

151.     Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Seroquel XR from generic competition. AstraZeneca's actions allowed it to maintain a monopoly and exclude competition in the market for quetiapine fumarate, *i.e.*, Seroquel XR and its AB-rated generic equivalents.

152.     Defendants' unlawful concerted action has (a) delayed and suppressed the sale of AB-rated generic Seroquel XR in the United States, (b) enabled AstraZeneca to sell Seroquel XR at artificially inflated, supracompetitive prices, (c) enabled Handa/Par and Accord to sell AB-rated generic Seroquel XR at artificially inflated, supracompetitive prices, and (d) caused Plaintiff and the Class to pay supracompetitive prices for extended-release quetiapine fumarate tablets.

153.    Typically, generic versions of brand-name drugs are initially priced significantly below the corresponding reference listed drug ("RLD") branded counterpart as to which they are AB-rated. As a result, upon generic entry, direct purchasers' purchases of brand drugs are rapidly substituted for generic versions of the drug for some or all of their purchases. As more generic manufacturers enter the market, prices for generic versions of a drug predictably plunge even further because of competition among the generic manufacturers, and, correspondingly, the brand name drug continues to lose even more market share to the generic versions of the drug.

154.    This price competition enables all purchasers of the drug to: (a) purchase generic versions of a drug at substantially lower prices; (b) purchase generic equivalents of the drug at a lower price, sooner; and/or (c) purchase the brand drug at a reduced price. Consequently, brand manufacturers have a keen financial interest in delaying and impairing generic competition, and purchasers experience substantial cost inflation from that delay and impairment.

155.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing with AstraZeneca, direct purchasers, such as Plaintiff and members of the Class, would have paid less for quetiapine fumarate by (a) substituting purchases of less expensive AB-rated generic Seroquel XR for their purchases of more-expensive branded Seroquel XR, (b) receiving discounts on their remaining branded Seroquel XR purchases, and/or (c) purchasing Seroquel XR at lower prices sooner.

156.    As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof at trial.

157.    Defendants' unlawful conduct deprived Plaintiff and the Class Members of the benefits of competition that the antitrust laws were designed to ensure.

## X.     CLAIM ACCRUAL AND/OR TOLLING

158.    Plaintiff's Complaint is timely as to all claims accruing on or after four years of the date of the filing of this Complaint.

159.    Plaintiff's pre-Complaint damages claims are also timely under the doctrines of equitable tolling, the discovery rule, and fraudulent concealment.

160.    These doctrines apply because (1) Defendants (and Accord) concealed from Plaintiff the existence of this cause of action, (2) Plaintiff remained in ignorance of this cause of action until on or about May 1, 2017 or later, and (3) Plaintiff's continuing ignorance was not attributable to lack of diligence on its part.

161.    Defendants (and Accord) concealed from Plaintiff the existence of its cause of action.

162.    Specifically, Defendants (and Accord) concealed from Plaintiff the terms of the Non-Compete Agreements pursuant to which AstraZeneca agreed not to launch authorized generic Seroquel XR during Handa/Par's and Accord's 180-day exclusivity periods—a common form of "pay-for-delay." Even when limited information about the Non-Compete Agreements was made available in SEC filings or press releases, the key illegal terms, the no-AG promises, were not disclosed. No publicly available information states that the Non-Compete Agreements precluded AstraZeneca from launching authorized generic Seroquel XR for 180 days following Handa/Par's and Accord's generic launches.

163.    Moreover, the Non-Compete Agreements were inherently self-concealing. Had their unlawful provisions not been kept secret, they would not have succeeded, because of, *inter alia*, the availability of injunctive relief to prevent their performance.

164.    Plaintiff remained in ignorance of this cause of action until some point within four

years of commencement of this action, and Plaintiff's continuing ignorance was not attributable to a lack of diligence on its part.

165.    Specifically, Plaintiff had insufficient knowledge of the Defendants' (and Accord's) anticompetitive conduct to file an antitrust claim until at least May 1, 2017. It was then, upon the expiration of Handa/Par's and Accord's 180-day exclusivity, that AstraZeneca did launch authorized generic Seroquel XR in all strengths. Before that time, Plaintiff lacked any actual or constructive knowledge of evidence from which to suspect an antitrust violation (a payment in the form of no-AG agreements) had occurred.

166.    Because Defendants (and Accord) concealed the illegal no-AG provisions in the Non-Compete Agreements, there was no way for Plaintiff to know about the unlawful conduct until approximately May 1, 2017, when AstraZeneca launched its authorized generic Seroquel XR products.

167.    Drug manufacturers typically communicate with Plaintiff about pending generic launches. The manufacturers provide this information so that Plaintiff and members of the Class can stock their drug products as soon as they are available in order to meet the demand of their pharmacy customers. Plaintiff would only have been aware of the illegal no-AG provisions sooner if one or more of the parties to the Non-Compete Agreements had made Plaintiff aware sooner that AstraZeneca delayed its launch of authorized generic Seroquel XR until May 1, 2017. Upon information and belief, no party to the Non-Compete Agreements made Plaintiff aware of AstraZeneca's May 1, 2017 authorized generic Seroquel XR launch before May 1, 2017. Accordingly, Plaintiff detected no suspicious conduct prior to AstraZeneca's launch of AG Seroquel XR on May 1, 2017, 180-days after Handa/Par's and Accord's launches of generic Seroquel XR.

168. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations for the Plaintiff's and the Class's claims have been tolled. Even absent fraudulent concealment, all applicable statutes of limitations are tolled by the doctrine of equitable estoppel.

169. Alternatively, if the statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and Plaintiff and members of the Class can recover for damages that they suffered during the limitations period.

## XI. CLASS ACTION ALLEGATIONS

170. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this action on behalf of a Direct Purchaser Class defined as follows:

> All persons or entities that directly purchased Seroquel XR in the United States and its territories and possessions at any time during the period September 29, 2011 through the present (the "Class Period").

> Excluded from the Direct Purchaser Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all governmental entities.

171. Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are between approximately fifty and one hundred fifty Class Members, geographically dispersed throughout the United States such that joinder of all Class Members is impracticable. Further, the Class is readily identifiable from information and records maintained by Defendants.

172. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff's interests are not antagonistic to the claims of the other Class Members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate. Plaintiff and all members of the Class were damaged by the same wrongful anticompetitive conduct of Defendants.

173. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

174. Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and who have particular experience with class action litigation involving alleged violations of antitrust law.

175. Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the entire Class. Therefore, determining damages with respect to the Class as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

176. The common legal and factual questions, which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class member, include, but are not limited to, the following:

    (a)  whether the conduct alleged herein constitutes a violation of the antitrust laws;

    (b)  whether Defendants conspired to suppress generic competition to Seroquel XR;

    (c)  whether Defendants' challenged conduct suppressed generic competition to Seroquel XR;

    (d)  whether a relevant antitrust market needs to be defined in this case in light of the existence of direct proof of AstraZeneca's power to exclude generic competition and charge supracompetitive prices for Seroquel XR and/or the *per se* illegal nature of the challenged conduct;

    (e)  if a relevant antitrust market needs to be defined, what the definition of the relevant antitrust market for analyzing AstraZeneca's monopoly power is, and whether AstraZeneca had monopoly power in the relevant antitrust market;

    (f)  whether AstraZeneca illegally obtained or maintained monopoly power in the

relevant market;

(g) whether Defendants' actions constituted a *per se* illegal market allocation or output restriction agreement, or whether Defendants' actions are subject to the antitrust rule of reason;

(h) whether Defendants' actions were, on balance, unreasonable restraints of trade;

(i) whether the activities of Defendants as alleged herein have substantially affected interstate commerce;

(j) whether, and to what extent, Defendants' conduct caused antitrust injury (overcharges) to Plaintiff and the Direct Purchaser Class; and

(k) the quantum of overcharge damages paid by the Class in the aggregate.

177. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

178. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XII.    CLAIMS FOR RELIEF

## COUNT 1 – VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 AGREEMENT NOT TO COMPETE WITH BRAND AND GENERIC SEROQUEL XR 50MG, 150MG, 200MG and 300MG STRENGTHS – ASTRAZENECA, HANDA, AND PAR

179. Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

180.    Defendants conspired and entered into unlawful contracts in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

181.    Defendants have engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

182.    On or about September 29, 2011, when the Handa Non-Compete Agreement was executed, and at times prior to the formal execution thereof, Defendants entered into an illegal contract, combination and conspiracy in restraint of trade under which AstraZeneca agreed to make a large reverse payment to Handa/Par in exchange for Handa/Par's agreement to delay bringing its 50mg, 150mg, 200mg and 300mg strengths (the "Handa/Par Strengths") of generic Seroquel XR to the market for up to 5 years. The purpose and effect of the Handa Non-Compete Agreement was to: (a) allocate to AstraZeneca 100% of the U.S. sales of extended-release quetiapine fumarate for the Handa/Par Strengths until November 1, 2016; (b) delay the availability of generic Seroquel XR in the Handa/Par Strengths in the United States, thereby protecting Seroquel XR from any generic competition in those strengths until November 1, 2016; (c) delay the entry of AstraZeneca's authorized generic in the Handa/Par Strengths until May 1, 2017, 180 days after Handa/Par's generic entry in the Handa/Par Strengths, and allocate to Handa/Par 100% of U.S. sales of generic extended-release quetiapine fumarate for the Handa/Par Strengths prior to that time; and (d) fix and maintain, at supracompetitive levels, the price Plaintiff and Class members paid for extended-release quetiapine fumarate in the Handa/Par Strengths.

183.    Par joined the illegal contract, combination and conspiracy in restraint of trade during its pendency when Par acquired Handa's ANDA and Handa assigned the Handa Non-

Compete Agreement to Par. Par then further participated in the illegal contract, combination and conspiracy in restraint of trade by performing and abiding by the unlawful Handa Non-Compete Agreement, by selling generic Seroquel at supracompetitive prices, and by dividing the ill-gotten gains with Handa.

184.    The Handa Non-Compete Agreement harmed Plaintiff and the Class as set forth above.

185.    Defendants are jointly and severally liable for the Handa Non-Compete Agreement under either the *per se* standard or the rule of reason standard.

186.    There is and was no legitimate, non-pretextual, procompetitive justification for the payment from AstraZeneca to Handa/Par that outweighs its harmful effect. Even if there were some conceivable such justification, the payment was not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

187.    As a direct, proximate, foreseeable, and intended result of Defendants' agreement in restraint of trade, as alleged herein, Plaintiff and the Class were harmed and suffered overcharge damages as aforesaid.

**CLAIM TWO**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(CONSPIRACY TO MONOPOLIZE AS TO BRAND AND GENERIC SEROQUEL**
**XR 50MG, 150MG, 200MG AND 300MG STRENGTHS – ASTRAZENECA,**
**HANDA AND PAR)**

188.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

189.    At all relevant times prior to November 1, 2016, AstraZeneca possessed substantial market power (*i.e.*, monopoly power) in the relevant market. AstraZeneca possessed the power to control and maintain prices in, prevent prices from falling in, and exclude

competitors from, the relevant market.

190. Through the Handa Non-Compete Agreement, AstraZeneca, Handa and Par conspired to unlawfully maintain AstraZeneca's monopoly power in the relevant market by agreeing to block and delay market entry of generic Seroquel XR in the Handa/Par Strengths.

191. The Handa Non-Compete Agreement (a) allocated to AstraZeneca 100% of the U.S. sales of extended-release quetiapine fumarate in the Handa/Par Strengths until November 1, 2016; (b) delayed the availability of generic versions of Seroquel XR in the Handa/Par Strengths in the United States, thereby protecting Seroquel XR in the Handa/Par Strengths from any generic competition until November 1, 2016; (c) delayed the entry of AstraZeneca's authorized generic in the Handa/Par Strengths until May 1, 2017, 180 days after Handa/Par's generic entry in the Handa/Par Strengths, and allocated to Handa/Par 100% of the U.S. sales of generic extended-release quetiapine fumarate in the Handa/Par Strengths prior to that time; and (d) fixed and maintained, at supracompetitive levels, the price Plaintiff and Class members paid for extended-release quetiapine fumarate in the Handa/Par Strengths.

192. The goal, purpose and/or effect of the Handa Non-Compete Agreement was to maintain, enhance, and extend AstraZeneca's monopoly power, in violation of Sherman Act Section 2, 15 U.S.C. § 2. The Handa Non-Compete Agreement was intended to and did prevent and/or delay generic competition to Seroquel XR in the Handa/Par Strengths and enabled AstraZeneca to continue charging supracompetitive prices for Seroquel XR in the Handa/Par Strengths without a substantial loss of sales.

193. Defendants knowingly and intentionally conspired to maintain, enhance, and extend AstraZeneca's monopoly power in the relevant market.

194. Defendants specifically intended that the Handa Non-Compete Agreement would

maintain AstraZeneca's monopoly power in the relevant market and injure Plaintiff and the Class thereby.

195.     Defendants each committed at least one overt act in furtherance of the conspiracy.

196.     As a direct, proximate, foreseeable, and intended result of Defendants' concerted monopolistic conduct, as alleged herein, AstraZeneca unlawfully maintained, enhanced, and extended its monopoly power and Plaintiff and the Class were harmed and suffered overcharge damages as a result, as alleged herein.

**CLAIM THREE**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(AGREEMENT NOT TO COMPETE WITH BRAND AND GENERIC**
**SEROQUEL XR 400MG STRENGTH – ASTRAZENECA)**

197.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

198.     AstraZeneca, with Accord, engaged in an unlawful contract, combination, or conspiracy that has unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

199.     On or about October 5, 2011, when the Accord Non-Compete Agreement was executed, and at times prior to the formal execution thereof, AstraZeneca entered into an illegal contract, combination and conspiracy in restraint of trade under which AstraZeneca agreed to make a large reverse payment to Accord in exchange for Accord's agreement to delay bringing its 400mg strength (the "Accord Strength") of generic Seroquel XR to the market for up to 5 years, the purpose and effect of which was to: (a) allocate to AstraZeneca 100% of the U.S. sales of extended-release quetiapine fumarate for the Accord Strength until November 1, 2016; (b) delay the availability of generic Seroquel XR in the Accord Strength in the United States, thereby protecting Seroquel XR from any generic competition until November 1, 2016; (c) delay

the entry of AstraZeneca's authorized generic in the Accord Strength until May 1, 2017, 180-days after Accord's entry with generic Seroquel XR in the Accord Strength, and allocate to Accord 100% of U.S. sales of generic extended-release quetiapine fumarate for the Accord Strength prior to that time; and (d) fix and maintain, at supracompetitive levels, the price Plaintiff and Class members paid for extended-release quetiapine fumarate in the Accord Strength.

200.    The Accord Non-Compete Agreement harmed Plaintiff and the Class as set forth above.

201.    AstraZeneca is jointly and severally liable for the Accord Non-Compete Agreement under either the *per se* standard or the rule of reason standard.

202.    There is and was no legitimate, non-pretextual, procompetitive justification for the large payment from AstraZeneca to Accord that outweighs its harmful effect. Even if there were some conceivable such justification, the payment (the no-AG provision) was not necessary to achieve, nor the least restrictive means of achieving, such a purpose.

203.    As a direct, proximate, foreseeable, and intended result of the unlawful Accord Non-Compete Agreement, as alleged herein, Plaintiff and the Class were harmed and suffered overcharge damages as alleged herein.

**CLAIM FOUR**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(CONSPIRACY TO MONOPOLIZE AS TO BRAND AND GENERIC SEROQUEL XR**
**400MG STRENGTH – ASTRAZENECA)**

204.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

205.    At all relevant times prior to November 1, 2016, AstraZeneca possessed substantial market power (i.e., monopoly power) in the relevant market. AstraZeneca possessed

the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

206. Through the Accord Non-Compete Agreement, AstraZeneca conspired with Accord to maintain, enhance, and extend AstraZeneca's monopoly power in the relevant market by agreeing to block and delay market entry of generic Seroquel XR in the Accord Strength.

207. The Accord Non-Compete Agreement (a) allocated to AstraZeneca 100% of the U.S. sales of extended-release quetiapine fumarate in the Accord Strength until November 1, 2016; (b) delayed the availability of generic versions of Seroquel XR in the Accord Strength in the United States thereby protecting Seroquel XR in the Accord Strength from any generic competition until November 1, 2016; (c) delayed the entry of AstraZeneca's authorized generic in the Accord Strength until May 1, 2017, 180 days after Accord's generic entry in the Accord Strength, and allocated 100% of U.S. sales of generic extended-release quetiapine fumarate in the Accord Strength to Accord prior to that time; and (d) fixed and maintained, at supracompetitive levels, the price Plaintiff and Class members paid for extended-release quetiapine fumarate in the Accord Strength.

208. The goal, purpose and/or effect of the Accord Non-Compete Agreement was to maintain, enhance, and extend AstraZeneca's monopoly power, in violation of Sherman Act Section 2, 15 U.S.C. § 2. The Accord Non-Compete Agreement was intended to and did prevent and/or delay generic competition to Seroquel XR in the Accord Strength and enabled AstraZeneca to continue charging supracompetitive prices for Seroquel XR in the Accord Strength until November 1, 2016 without a substantial loss of sales.

209. AstraZeneca knowingly and intentionally conspired, with Accord, to maintain, enhance, and extend AstraZeneca's monopoly power in the relevant market.

210.     AstraZeneca specifically intended that the Accord Non-Compete Agreement would maintain AstraZeneca's monopoly power in the relevant market, and injured Plaintiff and the Class thereby.

211.     As a direct, proximate, foreseeable, and intended result of the Accord Non-Compete Agreement, as alleged herein, AstraZeneca unlawfully maintained, enhanced, and extended its monopoly power and Plaintiff and the Class were harmed as a result, as alleged herein.

**CLAIM FIVE**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(MONOPOLIZATION AND MONOPOLISTIC SCHEME – ASTRAZENECA)**

212.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

213.     At all relevant times prior to November 1, 2016, AstraZeneca possessed substantial market power (i.e., monopoly power) in the relevant market. AstraZeneca possessed the power to control prices in, prevent prices from falling in, and exclude competitors from the relevant market.

214.     By entering into the Handa Non-Compete Agreement and the Accord Non-Compete Agreement, AstraZeneca willfully and intentionally maintained, enhanced, and extended its monopoly power using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiffs and the Class thereby. Specifically, AstraZeneca (a) allocated to itself 100% of the market for extended-release quetiapine fumarate in all strengths in the United States until November 1, 2016; (b) delayed the availability of generic versions of Seroquel XR in all strengths in the United States, thereby protecting Seroquel XR in all strengths from any generic competition until November 1, 2016; (c) delayed the entry of its

authorized generic in all strengths for 180 days after Par's and Accord's entry with generic Seroquel XR products, until May 1, 2017, and allocated 100% of U.S. sales of generic extended-release quetiapine fumarate in the Handa/Par Strengths to Handa/Par and 100% of U.S. sales of generic extended-release quetiapine fumarate in the Accord Strength to Accord prior to May 1, 2017; and (d) fixed and maintained, at supracompetitive levels, the price Plaintiff and Class members paid for extended-release quetiapine fumarate.

215.    It was AstraZeneca's conscious object to further its dominance in the relevant market by and through the anticompetitive conduct alleged herein.

216.    AstraZeneca's anticompetitive conduct harmed competition as alleged herein.

217.    As a direct, proximate, foreseeable, and intended result of AstraZeneca's illegal and monopolistic conduct, AstraZeneca unlawfully maintained, enhanced, and extended its monopoly power, and Plaintiffs and the Class were harmed as a result, as alleged herein.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Members of the Direct Purchaser Class pray for relief as set forth below:

A.    Certification of the Direct Purchaser Class pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiff as Class Representative for the Direct Purchaser Class and its counsel of record as Class Counsel for the Direct Purchaser Class;

B.    Permanent injunctive relief that enjoins Defendants from violating the antitrust laws and requires it to take affirmative steps to dissipate the effects of the violations;

C.    That acts alleged herein be adjudged and decreed to be unlawful monopolization in violation of the Sherman Act, 15 U.S.C. § 2;

D.     That acts alleged herein be adjudged and decreed to be unlawful overarching scheme to monopolize in violation of the Sherman Act, 15 U.S.C. § 2;

E.     That acts alleged herein be adjudged and decreed to be unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. § 1;

F.     That acts alleged herein be adjudged and decreed to be an unlawful conspiracy to monopolize in violation of the Sherman Act, 15 U.S.C. § 2;

G.     A judgment against Defendants for the damages sustained by Plaintiff and the Direct Purchaser Class defined herein and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

H.     By awarding Plaintiff and Members of the Direct Purchaser Class pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

I.     The costs of this suit, including reasonable attorney fees; and

J.     Such other and further relief as the Court deems just and proper.

## XIV.     JURY DEMAND

Plaintiff, on behalf of itself and others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.


DATED:  February 7, 2020                    Respectfully submitted,

                                            /s/ Stephanie E. Smith
                                            Michael L. Roberts
                                            Debra G. Josephson
                                            Karen S. Halbert
                                            Stephanie E. Smith
                                            Sarah E. DeLoach
                                            William R. Olson
                                            ROBERTS LAW FIRM, P.A.

20 Rahling Circle
Little Rock, AR 72223
Telephone: (501) 821-5575
Facsimile: (501) 821-4474
mikeroberts@robertslawfirm.us
debrajosephson@robertslawfirm.us
karenhalbert@robertslawfirm.us
stephaniesmith@robertslawfirm.us
sarahdeloach@robertslawfirm.us
williamolson@robertslawfirm.us

Dianne M. Nast
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Telephone: (215) 923-9300
Facsimile: (215) 923-9302
dnast@nastlaw.com

*Counsel for KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc. and the putative Direct Purchaser Class*